UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
ROBERT LEMMO,

               Plaintiff,

         - against -

CITY OF NEW YORK, DETECTIVE MICHAEL
CERVINI, and DETECTIVE EDWARD
SPAGNUOLO,

            Defendants.
----------------------------------------------------------------x

**MEMORANDUM & ORDER**

08 CV 2641 (RJD)

DEARIE, District Judge.

     In this action under 42 U.S.C. §1983, pro se plaintiff Robert Lemmo alleges that New York City Police Detectives Michael Cervini and Edward Spagnuolo of the 114th precinct in Queens (the "detective defendants") used excessive force against him during an incident that culminated in his arrest on July 27, 2007.  Liberally construed, the complaint pleads five distinct claims of such force; the complaint also contains loosely structured, related allegations of police misconduct during the ensuing prosecution.

     Asserting qualified immunity, the detective defendants move under Rule 56 of the Federal Rules of Civil Procedure for summary judgment on all but one of plaintiff's excessive force claims. They also move for summary judgment on other grounds on all remaining claims. The City of New York (the "City") moves for summary judgment on all claims, on the ground that plaintiff can prove no set of facts upon which the municipality could be found be liable.

     As detailed below, the Court finds itself constrained by established summary judgment standards to allow certain of plaintiff's excessive force claims to proceed to trial.  But the Court nevertheless has misgivings.  Handing Mr. Lemmo even a partial summary judgment victory—

and his second in as many lawsuits[1]— may serve to validate Mr. Lemmo's apparent sense that, having learned the section 1983 ropes, he can continue, with impunity, to generate lawsuits by engaging in misconduct intended to provoke the police to overreact with arguably actionable excessive force.  At the same time one cannot entirely discount Mr. Lemmo's side of the matter; for all his nagging recidivism (the arrest leading to this lawsuit is his 40th), there may well be a degree of police targeting at play, and ordering a second set of officers to trial on Lemmo's excessive force claims can hardly serve to douse any lurking retaliatory animus.  The Court's role on summary judgment, of course, is not to make credibility findings or to engage in speculation but merely to decide, as it has, that the parties' fates with respect to certain claims lie with the jury.  But as gatekeeper of its docket the Court cannot abdicate its duty to warn litigants that it is not blind to the apparent reality beneath the lawsuits and that enough is enough.

For the reasons set forth below, the detective defendants' assertion of qualified immunity with respect to certain of plaintiff's excessive force claims is denied; their motion for summary judgment with respect to all other claims is granted; and the motion of the City is granted in its entirety

## BACKGROUND

### A.    Plaintiff's Criminal History

The Court begins its review of the facts with plaintiff's 55-page criminal history "report," which speaks for itself.  See N.Y. State Criminal History Information, Def. Ex. C.  As the report documents, the arrest giving rise to this lawsuit was plaintiff's fortieth.  Id.  Thirty-eight (38) of

---

[1]  In Mr. Lemmo's other pending lawsuit against Queens police officers, the Court recently concluded that Mr. Lemmo's excessive force claim was jury-worthy.  See Lemmo v. McKoy, No. 08 CV 4264, 2011 WL 843974 (E.D.N.Y. Mar. 8, 2011) ("Lemmo I").

the forty arrests occurred within the Borough of Queens, and twenty-five (25) of these were made by officers of the 114th precinct (i.e., the home precinct of defendant detectives Cervini and Spagnuolo). [2]

As a result of his first 39 arrests, plaintiff faced a total of 106 charges, slightly more than half of which were misdemeanors, the remainder felonies.  His conviction tally before the arrest in this case stood at 46, of which 6 were for felonies.

The arrest giving rise to this lawsuit (*i.e*, the one occurring on July 27, 2007) produced a total of 16 charges:  four felonies (first-degree reckless endangerment, assault of a police officer, and criminal mischief in the first and second degree), eight misdemeanors (grand larceny, second degree reckless endangerment, assault, unauthorized use of a motor vehicle, criminal mischief, criminal possession of stolen property, resisting arrest, aggravated unlicensed operation of a motor vehicle, and reckless driving), and three infractions (driving without a license, failure to obey a traffic device, and driving the wrong way on a one-way street).  See N.Y.P.D. Arrest Report, Def. Ex. F.  Plaintiff was convicted, after a jury trial in Queens Supreme Court, on eight charges.  See Certificate of Disposition, People v. Lemmo, Ind. No. 2035-07, Sup. Ct. Queens Co, Def. Ex. J.   He was acquitted of the more serious count of reckless endangerment, as well as the assault, criminal mischief and speeding charges.   Id.


**C.     The Events of July 27, 2007**

According to the arrest report prepared by Detective Cervini, he

---

[2] Of the remaining Queens arrests, three occurred in the neighboring 115th precinct. Others were made by officers of the 109th and 102nd precincts and by the New York City Housing Police.  Outside of Queens, plaintiff was arrested once in Manhattan and once in New Rochelle, New York.

> observed the defendant [Lemmo] operating a 1996 Jeep Cherokee
> Penn[sylvania] Plate GHV-3089 with the driver door lock removed
> and the air bag missing[.]  [U]pon approach of the defendant he did
> drive his auto toward arresting officer and partner in an attempt to
> strike them.  Defendant did run over arresting officer['s] left foot
> causing pain and severe swelling.  Defendant did engage the
> officers in a pursuit driving on the sidewalk missing numerous
> pedestrians walking and children playing.  Defendant did cause
> property damage in excess of [one] thousand dollars.  Defendant
> did resist arrest by flailing his arms and refusing to be cuffed.
> Necessary force was used to affect the arrest.

Ex. F.

This core account was fleshed out through Detective Cervini's testimony at plaintiff's

criminal trial, see People v. Lemmo, Transcript, Sept. 8, 2008 at pp. 396-404, Def. Ex. H, and

contradicted in parts by plaintiff's testimony at that same trial, see id. at pp. 933 et seq., Def. Ex.

G, and by the testimony plaintiff gave at his deposition on August 19, 2009.  See Def. Ex. D.

According to Detective Cervini, on the evening of July 27, 2007, he and Detective

Spagnuolo were driving a prisoner van as part of a Narcotics Division observation team pursuant

to the 114th precinct's "Tactical Plan."  At approximately 8:00 p.m., they observed plaintiff in the

Jeep double-parked in front of the Woodside Housing Project at 31st Avenue and 49th Street; the

detectives noticed that the Jeep had Pennsylvania license plates and that the driver's side door

lock and airbag were missing.  In his testimony, Cervini does not suggest that plaintiff, while

double-parked in his vehicle, was armed, threatening, or engaged in active misconduct; rather,

Cervini asserts only that "[u]pon observing plaintiff's Jeep," he made a U-turn and approached it,

positioning the van so that its front end was facing the front end of plaintiff's Jeep.[3]  Cervini then

---

[3] Although defendants' motion papers state that the Pennsylvania plates were registered
to a different vehicle (not the Jeep plaintiff was operating), it appears that this fact did not
emerge until trial.

put a red bubble light on the dashboard of the van to indicate that plaintiff was not to depart. Plaintiff, however, began to drive away, in reverse, ignoring Cervini's orders to pull over.

At his deposition, however, plaintiff offered a different account and sought to cast the detectives as instigators. His narrative begins with him double-parked outside the housing project where a friend of his lived. Plaintiff was talking on his cell phone with that friend when he noticed the police van approaching. Plaintiff and Cervini "both look[ed] at each other" and plaintiff thought, "Here we go… they [are] going to start with me." Ex D at 107. It was because of his history with the local police that, in traveling to the housing project, he had "take[n] the side streets" to avoid the precinct (he testified that he feared what would happen "if one of them sees [him]") and because of that same history that, upon the van's approach, he chose to depart by "[going] to the corner and [making] a U-turn." Asked twice why he did not simply stay parked in his vehicle when the van driven by Detective Cervini was approaching, plaintiff testified that he feared "they are going to hit me" (Ex. D at 109), and that "[t]hey were going to harass [him], maybe beat [him] up, maybe lie." Ex. D at 110. Plaintiff offered the same testimony at his criminal trial: "What happened is . . . Detective Cervini and Officer Spagnuolo. . . drive by. We all know each other, okay. They know me. I have been in trouble before. I have done jail time, okay. Every time they see me they want to stop me." Ex. G at 933. He further testified that he fled the approaching police van in order "to get away from a beating" that he was sure "was coming [his] way." Id. at 1118.

There is no dispute that there ensued a car chase of several blocks' duration through populous residential Queens streets, and that in the course of that chase plaintiff drove up on a sidewalk and through grass, partially damaged a fence, and, undoubtedly, placed pedestrians and other drivers at risk. There is also no dispute that the chase came to its end shortly after plaintiff

5

made a right turn from 30th Avenue onto 42nd Street, a narrow one-way (southbound) street; plaintiff's turn onto that street placed him in the northbound direction.  But the parties' accounts of what occurred on 42nd Street differ materially.

In their Rule 56.1 Statement of Undisputed Facts, defendants state only that "[t]he pursuit concluded in the vicinity of 42nd Street, where plaintiff's Jeep came to a stop," that "[a]t the conclusion of the pursuit, an officer approached plaintiff's driver's side window and struck plaintiff with his fists in order to subdue him," and that "[a]t no point did plaintiff turn off the Jeep's ignition."  Defs. 56.1 at ¶¶ 19-21.   Finally, "[a]t the conclusion of the pursuit, plaintiff was pulled through the window of his car and handcuffed by Det. Cervini."  Id. ¶ 22.

Plaintiff, however, has offered testimony that, if credited, suggests that he voluntarily terminated the chase before the police used force, and that force was therefore not necessary to subdue him.  According to plaintiff, he "went up [42nd Street] a little" and "pulled over."  Ex D. at 123.  He saw that the sidewalk was full of people, he detected that he had a flat tire, and he declared the flight effort "a dead issue."  Id.  "[T]he next thing [he] knew," the van driven by Detective Cervini "crashed into [the driver's side] door" of the Jeep.  Id. at 123.  Plaintiff testified that he was "seat belted in" and that the police van had him "pinned in."  Id. at 124.

Although defendants' Rule 56.1 Statement does not address whether Cervini crashed into plaintiff's Jeep and whether plaintiff was thereby "pinned in," Cervini's testimony at plaintiff's criminal trial touches on the matter.  Cervini testified that at the conclusion of the chase, when he approached the stopped Jeep, plaintiff "had a blank stare" and was "trying to get [the car] in drive," Ex. H at 464, but Cervini was also sure that "[t]here were no keys in the ignition that [he] could see."  Id. at 467.   Cervini further testified that when he (Cervini)  "was trying to get [plaintiff] out of the car" and "trying to get [himself into the car [to] grab him," the car "went

forward a little bit" and "ran over [his] left foot."  Def. Ex. H at 464.  Cervini further testified

that he "couldn't open the door" because it was "kind of like jammed closed," id. at 465, and

that: "I was trying to get the car to stop.  And at that point I tried to grab him through the

window.  And that wasn't working. So I, I, I proceeded to strike him numerous times to stop this

car from moving and trying to get him out of the car."  Id. at 465.  Asked specifically "at what

point did the wheel ride over [his] foot," Cervini replied: "Between the time I was going, trying

to get him out, we were wrestling around.  When he was trying to – just the car went forward

again and that's when it ran over my foot."  Id.  Asked whether he "punch[ed] [plaintiff] before

or after [his] foot was run over," Cervini testified: "I punched him before and I punched him

after."  Id.

   Plaintiff, however, testified at his deposition that he and the car were motionless when

one of the officers jumped out of the police van and "smashed [plaintiff] right through the [open

driver's side] window."  Id. at 123-24.  Plantiff believes he was punched four or five times.  Id.

at 124.  (Plaintiff also believes that it was Detective Spagnuolo who punched him but, as noted,

Cervini admits that he inflicted the blows).  At his criminal trial plaintiff also testified that, after

making the final right turn onto 42nd Street, he brought his vehicle and his attempt to flee to a

full stop: "I pulled over and stopped … I put my vehicle in park. . . I can't ascertain whether or

not I shut off the ignition.  I definitely put it in park.  And I was highly upset with myself, the

whole situation that had just occurred.  And I knew right there obviously I was going to be

arrested."  Ex. G. at 1155.

   There is no material dispute about plaintiff's ensuing removal from the vehicle and

handcuffing.   Compare Def. 56.1 Statement at ¶22 with Plf. Dep. (Ex. D) at 124.  Either because

the Jeep's driver door was jammed, as defendants claim, or, because plaintiff was pinned in by

the police van which had crashed into the Jeep, as plaintiff claims, the detectives removed plaintiff through the vehicle's open window, dragged him to the ground, and handcuffed him. (According to plaintiff, whose account includes the van crashing into his Jeep, he was first dragged over and across the police van before being cuffed on the ground.)

Despite the defendants' assertions that force was necessary to subdue plaintiff and/or to stop the Jeep's flight, Detective Cervini, noting that "[i]t's very difficult to handcuff somebody that doesn't want to be handcuffed," admitted that at the point of arrest, plaintiff "wasn't resisting so it was easy" to "just . . . snap" on the handcuffs. Ex. H at 474.

According to plaintiff, the detectives exercised unnecessary force after he was handcuffed and despite his lack of resistance.  He testified that once he was handcuffed, he "didn't resist at all, no flapping or nothing," and that one of the detectives (Spagnuolo, he believes) nevertheless proceeded to "snap[]" his thumbs.  Id. at 126.  Plaintiff described the act as a "crunch," like a "knuckle: [t]he whole bone popped and ripped right through the pad."  Id.  Plaintiff also described this act as a "squeezing" of his thumb bones.  Ex. G at 1106.  One of the detectives also "hit [plaintiff] with [an] elbow" and stood on plaintiff's back "like [he was] digging his foot in the right hips."  Ex. D at 126.  Plaintiff also described this act as having a knee on his back, and as one of the detectives stepping on his kidney with a "twisting" and "alternating" motion, "like he was putting out a cigarette."  Ex. G at 1106.  Additionally, plaintiff accuses one of the officers with having threatened to pepper spray him, and with having deliberately tightened the handcuffs as tight as possible while walking him up and down the street to exacerbate the pain. See generally Complaint ¶¶ 7-8.

**D.     Medical Attention**

The punches to plaintiff's head apparently caused enough bleeding to prompt a call for an ambulance, which took him to Elmhurst Hospital Center.  <u>See</u> Elmhurst Records, Def. Ex. J. Plaintiff's principal complaints were swelling and numbness in the left wrist, pain in his right wrist and hand, difficulty moving his fingers, and lacerations on his head; he did not complain of back pain.  Ex. I at 1.  Hospital staff sterilized and sutured a three-inch laceration on plaintiff's left scalp; applied a splint to his right thumb, where plaintiff had a displaced fracture of the first metacarpal (a bone at the base of the thumb); and discharged plaintiff the following morning with a pain level of 0 out of 10.  Ex. I at 9, 11.

**DISCUSSION**

**I.     SUMMARY JUDGMENT STANDARDS**

The Court assumes the parties' familiarity with the Court's recent summary judgment decision in plaintiff's other pending excessive force case involving Queens police officers.  <u>See</u> <u>Lemmo v. McKoy</u>, No. 08 CV 4264, 2011 WL 843974 (E.D.N.Y. Mar. 8, 2011) ("<u>Lemmo I</u>"). The parties' familiarity with the established summary judgment standards is therefore also assumed.  <u>See generally</u> Fed. R. Civ. P. 56(c)(2); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) ("some metaphysical doubt as to the material facts" does not entitle a plaintiff to proceed to trial on her claim); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317(1986); <u>Sledge v. Kooi</u>, 564 F.3d 105, 108 (2d Cir. 2009) (the record is to be construed in the light most favorable to the party opposing summary judgment, all reasonable inferences must be drawn in his favor, and all ambiguities resolved his way**).**

## II.    THE EXCESSIVE FORCE CLAIMS

Plaintiff's complaint alleges five discrete acts of one or both of the detective defendants as actionable excessive force:

(i)     driving the police van into the driver's side door of the Jeep, stopped on 42nd Street, in order to pin plaintiff in (Complaint ¶ 4);

(ii)    repeatedly punching plaintiff in the head while he was pinned in the Jeep (id. ¶ 5);

(iii)   twisting plaintiff's thumb, until it broke, while plaintiff was handcuffed and not resisting (id.  ¶ 6);

(iv)    threatening the use of pepper spray, and kneeing and stepping on plaintiff's kidney area, both while plaintiff was handcuffed face-down on the ground and not resisting (id. ¶ 7); and

(v)     tightening plaintiff's handcuffs while walking him up and down the block (id. ¶ 8).

The detective defendants do not seek summary judgment on excessive force claim (iii); in their words, "[t]hough [they]  deny [this] allegation . . ., [they] concede that issues of material fact remain with respect to this claim."  (Def. Supp. Mem., at 2 n.1.)

## A.    Legal Standards:
## Qualified Immunity and Excessive Force

"The doctrine of qualified immunity," as the Supreme Court explained, "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotations and citations omitted).   As the Court further explained,

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact. . . .
>
> Because qualified immunity is an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial.

Id. (all internal quotations and citations omitted).

Prior to Pearson, courts resolving assertions of qualified immunity in excessive force cases followed the two-step framework of Saucier v. Katz, 533 U.S. 194 (2001); in Pearson, however, the Supreme Court retreated from Saucier simply to the extent of making the step-one inquiry optional, 555 U.S. at 813, but otherwise left Saucier undisturbed.  In Cowan v. Breen, 352 F.3d 756 (2d. Cir. 2003), the Second Circuit addressed the Saucier framework at length:

> the threshold question is whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation.  The inquiry is whether the use of force was objectively unreasonable.  Thus, claims that an officer made a reasonable mistake of fact that justifies the use of force are considered at this stage of the analysis.  If the plaintiff fails to establish a constitutional violation, the qualified immunity inquiry ends and the plaintiff may not recover.  If, however, a constitutional violation can be shown, the court must then determine whether the constitutional right was clearly established at the time of the constitutional violation.  This inquiry focuses on whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted.  Resolution of this inquiry is purely legal in that it depends upon whether the law put the officer on notice that this conduct would be unlawful.

Id. at 761 (all internal quotations and citations omitted).

With respect to the second prong, the Supreme Court has further explained the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a

broad general proposition." <u>Saucier</u>, 533 U.S. at 201.  The Supreme Court elaborated upon this

point in <u>Brosseau v. Haugen</u>, 543 U.S. 194 (2004), which involved a claim of excessive force in

the context of a car chase.  The Court held that, when assessing whether officers violated a

"clearly established" constitutional right, it was error to look only to the "general [Fourth

Amendment] tests" of <u>Graham v. Connor</u>, 490 U.S. 386 (1989) and its progeny.[4]  <u>Id.</u> at 198.

Rather, "the right the official is alleged to have violated must have been 'clearly established' in a

more particularized, and hence more relevant sense" and "[t]he contours of the right must be

sufficiently clear that a reasonable official would understand that what he is doing violates that

right." <u>Id.</u> at 199 (internal quotations and citations omitted).  The Court went on to demand of the

parties "cases relevant to the [specific] situation . . . confronted"  (in that case, "whether to shoot

a disturbed felon, set on avoiding capture through vehicular flight, when persons in the

immediate area are at risk from that flight").  <u>Id.</u>

     Still, the Second Circuit has acknowledged that in many excessive force cases, "the

various parts of the <u>Saucier</u> analysis ultimately converge on one question:  Whether in the

particular circumstances faced by the officer, a reasonable officer would believe that the force

employed was lawful." <u>Cowan</u>, 352 F3d at 764 n.7.

**B.     Analysis**

     Focusing first on the first two claims, which occurred at the close of the chase and before

plaintiff was removed from the vehicle, the defendant detectives appear to address themselves to

---

[4] Like his excessive force claims in <u>Lemmo I</u>, plaintiff's claims here relate to events that took place prior to arraignment, so for purposes of assessing whether the detectives violated a constitutional right of plaintiff – i.e., the optional <u>Saucier</u> step-one inquiry – the Fourth Amendment standards of <u>Graham v. Connor</u> govern.  Those standards are discussed extensively in <u>Lemmo I</u> and not restated here.  <u>See</u> <u>Lemmo I</u>, 2011 WL 843974 at *4-8.

both prongs of the <u>Saucier</u> test by arguing that their actions with respect to plaintiff were not objectively unreasonable (under <u>Graham</u> and its progeny) and that in any even they did not violate any right that was clearly established at the time of the relevant events.  In particular, they understandably rely upon <u>Scott v. Harris</u>, 550 U.S. 372 (2007),  where the Supreme Court held that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."  <u>Id.</u> at 386.  <u>Scott</u>, of course, counts for purposes of the "clearly established" test because it was issued April 30, 2007, approximately three months before the events giving rise to this lawsuit.  The defendant detectives also rely on <u>Brosseau</u>, noted above, a 2004 deadly force case, in which the Supreme Court concluded that an officer who shot a suspected felon who was actually fleeing was entitled to qualified immunity.

These authorities speak for themselves.  So does much of the record in this case.  A vehicle in frantic flight from the police through residential streets poses inordinate and unacceptable risks, and the police have a duty to use all necessary means to bring the chase to a close.   The Court is also mindful of "the importance of resolving immunity claims at the earliest possible stage of the litigation," <u>Pearson</u>, 555 U.S. at 231.  The Court is constrained, however, to deny the claim of qualified immunity at this time because the record does not appear to tell the entirety of the relevant story and because material facts upon which both prongs of the immunity analysis turn are in dispute, including whether the chase was actually terminated at the time the challenged force was exercised, whether plaintiff continued to pose a potential safety threat to the officers and, therefore, whether the challenged actions were reasonable under the totality of the circumstances.  With the required "careful attention to the facts and circumstances of [this] particular case," <u>Graham</u>, 490 U.S. at 386, and drawing all reasonable inferences in plaintiff's

favor at this, the summary judgment stage, the Court cannot ignore that plaintiff's account and that offered by the detectives are in conflict on these critical points.  See Cowan, 352 F.3d at 763 (in section 1983 excessive force case, qualified immunity denied at summary judgment stage because "issue turns on which of two conflicting stories best captures what happened on the street") (internal quotation and citation omitted).   It is the role of the factfinder at trial, not the Court at summary judgment, to sort out exactly what occurred as and immediately after the car chase terminated.

Moving to the post-handcuffing claims, where the detective defendants appear to advance a straightforward summary judgment claim rather than an assertion of qualified immunity, it is likewise for a jury to decide whether to credit plaintiff's claim that he was not resisting when the handcuffs were tightened to their maximum, for apparently gratuitous reasons, and when his back kidney area was kneed and stepped on.  The detective defendants understandably argue that the injury resulting from these acts falls in the category of the de minimis and non-actionable. See Lemmo I, 2011 WL 843974 at *5-7 (reviewing authorities).  But as the Court explained in Lemmo I, "a jury may consider the lack of serious injury as evidence that the implemented force was not excessive," id. at 7 (quoting Davenport v. County of Suffolk, 2007 WL 608125 (E.D.N.Y. Feb. 23, 2007)), while nevertheless concluding that "intentional, gratuitous uses of force that are not required to subdue an individual likely fail the Graham objective reasonableness test," id. at 6, and appropriately award plaintiff nominal damages.[5]

_____

[5] The Court does grant summary judgment in favor of the detective defendants, however, with respect to the branch of excessive force claim (iv) that alleges that the detectives threatened to pepper spray plaintiff.   There is no record testimony to support the bald assertion, and in any event, that "threat" would not be actionable as an actual use of excessive force. Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional or reprehensible it might seem, does

III.     **THE REMAINING CLAIMS**

Plaintiff alleges that Detective Cervini or Spagnuolo illegally searched and seized him on July 17, 2007, provided false statements in his felony complaint, fabricated evidence of property damage caused by plaintiff, and fabricated a statement made by plaintiff following his arrest. Complaint ¶¶ 10-12.  Liberally construing these allegations as claims for false arrest, malicious prosecution or other misconduct actionable under Section 1983, the Court concludes that defendants are entitled to summary judgment dismissing these claims.

A.     <u>Malicious Prosecution</u>

To establish malicious prosecution under New York law and for Section 1983 purposes, a plaintiff must show that (1) a criminal proceeding was commenced or continued against him; (2) the proceeding terminated in his favor; (3) there was no probable cause for the criminal proceeding; and (4) the prosecution was initiated with actual malice.  <u>Ostroski v. Town of Southold</u>, 443 F. Supp. 2d 325, 335 (E.D.N.Y. 2006) (internal citations omitted); <u>Janetka v. Dabe</u>, 892 F.2d 187, 189 (2d Cir. 1989) (internal citations omitted).  "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty."   <u>Boyd v. City of New York</u>, 336 F.3d 72, 76 (2d Cir. 2003).

It is axiomatic that plaintiff cannot base a malicious prosecution claim on the eight charges for which he was convicted.  <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994). Plaintiff's claim that <u>Heck</u> does not so bar him because he has appealed his convictions is unavailing.  To be sure, <u>Heck</u> would permit a claim where the conviction has actually "been reversed on direct appeal," <u>id.</u> at 487, but plaintiff has furnished no particulars to support his bald

---

not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983") (internal quotation and citation omitted).

assertion that he took an appeal and, although it is not their burden to do, defendants' report that they undertook a search of the Second Department CourtAlert and found no evidence of the appeal.

With respect to the charges of which plaintiff was acquitted, assuming without deciding that these portions of the verdict constitute a "termination in plaintiff's favor" within the meaning of Janetka, 892 F.2d 189-90, the malicious prosecution claims premised on them nevertheless fail because of a lack of proof on the lack-of-probable-cause element.  See Celotex Corp. v. Catrett, 477 U.S. 317 at 322-23 (Rule 56 mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.") (internal citations omitted).  Accord Parker v. Sony Pictures Entertain-ment, Inc., 260 F.3d 100, 111 (2d Cir.2001) (defendant "need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial [but] need only point to an absence of proof on plaintiff's part").

The Court concludes that plaintiff can prove no set of facts establishing a lack of probable cause to bring each of the charges of which he was acquitted.  Those charges, as noted, include the felonies of reckless endangerment in the first degree and criminal mischief in the third degree, as well as criminal mischief in the fourth degree (a misdemeanor) and speeding (a violation).  "[F]acts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty," Boyd, 336 F.3d at 76, unquestionably existed as to each of these crimes.

Under New York law, a person "is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person." N.Y. Penal Law §120.25. The detective defendants' first-hand observation of plaintiff's reckless maneuvers (including driving in reverse, on a sidewalk, and the wrong way down a one-way street) as they trailed his vehicle through pedestrian-filled residential streets gave them abundant reason to believe that plaintiff committed the crime of reckless endangerment. As for criminal mischief, see generally N.Y. Penal Law § 145.00 ("Criminal mischief in the fourth degree"); N.Y. Penal Law § 145.05 ("Criminal mischief in the third degree"), the essence of the crime is "a culpable mental state" (either acting "intentionally" or "recklessly"), "damage to the property of another, and no right to do so nor any right to believe one has such right." 39 McKinnney's Cons. Laws of N.Y., Practice Commentary to N.Y. Penal Law § 145.00 at p. 186. The crime is one of third degree when the damage caused is valued between $250 and $1,499, but one of fourth degree if the damage is valued at a lesser amount. Id.

Two sets of circumstances establish probable cause to believe that plaintiff was guilty of criminal mischief. The first is the condition of the Jeep: the fact that plaintiff was a local resident well known to the detectives but was driving a vehicle (i) with out-of-state plates, (ii) that was missing a door lock, and (iii) from which the airbag had been removed, would certainly give the observing detectives, or reasonable officers in their shoes, more than probable cause to believe that plaintiff had participated in the destruction of valuable property that was not his own. Separately, the evidence establishes that the Jeep in flight caused the destruction of property when it drove onto a sidewalk and then knocked over a fence on 47th Street.

Finally, as for the speeding charge, plaintiff admitted in his deposition that the Jeep reached a speed of approximately 40 miles per hour while on residential streets; despite the jury's eventual decision not to convict, the detectives trailing plaintiff obviously had probable cause to believe that plaintiff had exceeded the speed limit.  In sum, defendants are entitled to summary judgment on all aspects of plaintiff's malicious prosecution claim.[6]

B.    False Arrest

To the extent the complaint asserts a claim for false arrest, that claim suffers the same fate as the malicious prosecution claim, and for the same reason.  See Martinez v. Golding, 499 F. Supp. 2d 561, 567 (S.D.N.Y. 2007) ("Under §1983 and New York law, probable cause constitutes a complete defense to a claim for false arrest").

C.    Other Misconduct

Plaintiff alleges that Detective Spagnuolo committed perjury and tampered with physical evidence by providing the Queens District Attorney with a false statement that plaintiff allegedly made while at Elmhurst Hospital shortly after his arrest, and that Detective Cervini committed perjury and tampered with physical evidence by providing the Queens District Attorney with "a false scenario and photos of property damage supposedly caused" by plaintiff.  Complaint ¶¶ 10-11.  Although plaintiff has, with the zeal of underscoring, text-boxing and arrows, purported to offer what he labels "Proof of Perjury," see Docket Entry 7, pp. 7 et seq., the Court can discern no actual proof of the alleged perjury or of the other alleged misconduct either in that document or in the record that has been presented on these motions.  Accordingly, defendants are entitled

_____

[6] Plaintiff understandably argues that his history with the police officers in the 114th and neighboring precincts should give rise to an inference in his favor on the malicious prosecution claims.  To the extent such an inference were available, it would go only to the element of "malice," which is distinct from the element of a lack of probable cause, and both are required elements of a claim for malicious prosecution.  Ostroski, 443 F. Supp. at 335.

to summary judgment on these claims of misconduct during the prosecution.  See Celotex, 477 U.S. at 322-23 ("complete failure of proof concerning an essential element of the nonmoving party's case" requires the granting of summary judgment).

       D.    Unlawful Search and Seizure

       In paragraph 12 of his complaint, plaintiff asserts that Detective Cervini conducted illegal searches and seizures upon plaintiff in violation of his constitutional rights on three separate occasions: on January 5, 2007, on January 30, 2007, and on February 24, 2007.  Defendants do not move for summary judgment on this claim but ask only for a ruling that, should plaintiff succeed on these claims, his recovery be limited to nominal damages.   The Court denies branch of defendants' application at this time, without prejudice and subject to renewal at the time of trial.

       E.    Municipal Liability

       Plaintiff originally named the New York Police Department ("NYPD") as a defendant; by order dated August 25, 2008, Judge Bloom replaced the NYPD with the City as the proper defendant pursuant to NYC Charter § 396.  The City seeks dismissal on the ground that plaintiff cannot establish any set of facts upon which the municipality could be found liable.  The Court agrees.

       "In order to assert a claim against the City under Section 1983, a plaintiff must demonstrate that the City, "under color of some official policy, 'cause[d]' an employee to violate another's constitutional rights."  See Harper v. City of New York, 424 Fed. Appx. 36, 38, 2011 WL 2199973, at *2 (2d Cir. June 7, 2011) (summary order) (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 692 (1978)).  A Section 1983 plaintiff "must thus show two basic elements: (1) 'the existence of a municipal policy or custom . . . that caused his

injuries beyond merely employing the misbehaving officer[s]' and (2) 'a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights.'" Harper, 424 Fed. Appx. at 38, 2011 WL 2199973, at *2 (citation omitted) (internal quotation marks omitted). As such, "a municipality cannot be held liable *solely* because it employs a tortfeasor– or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Monell, 436 U.S. at 691 (emphasis in original). Rather, a plaintiff must demonstrate that an identified municipal policy or practice was "the moving force of the constitutional violation." Id. at 694.

Here, plaintiff has not pled that the alleged constitutional violations of which he suffered were the result of a policy or practice of the City. This failure alone requires dismissal of the City as a defendant. See, e.g., Overhoff v. Ginsburg Dev., LLC, 143 F. Supp. 2d 379, 389 (S.D.N.Y. 2001) (dismissing Section 1983 complaint against municipality due to plaintiff's failure to "allege that her constitutional rights were violated pursuant to any municipal policy or custom"). Even if his pleading were adequate, plaintiff has not offered any evidence that would support a claim of municipal liability. Accordingly, the City is entitled to summary judgment in its favor on each of plaintiff's claims. See Celotex, 477 U.S. at 322-23 ("complete failure of proof concerning an essential element of the nonmoving party's case" requires the granting of summary judgment).

**CONCLUSION**

The motion of the City of New York for summary judgment on each of plaintiff's claims is granted in its entirety and the City is hereby dismissed from this action. The application for a ruling limiting plaintiff to recovery of nominal damages on his unlawful search and seizure

claims is denied without prejudice. The motion of the detective defendants for summary judgment is granted only with respect to plaintiff's claims for false arrest, malicious prosecution, misconduct during the prosecution, and the branch of the excessive force claim that alleges the threatened use of pepper spray.  The detective defendants' motion for summary judgment and assertion of qualified immunity with respect to the remaining branches of plaintiff's excessive force claim are denied.


SO ORDERED.

Dated: Brooklyn, New York
          September  30, 2011                                    s/ Judge Raymond J. Dearie
                                                                 _____
                                                                 RAYMOND J. DEARIE
                                                                 United States District Judge